IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

JUAN ANTHONY SANCHO, *an individual,*

                                  Case No. 1:20-cv-01232-CL

                Plaintiffs,

    v.

                                     FINDINGS AND
                                RECOMMENDATION

JACKSON COUNTY, *an Oregon governmental entity, et al,*

                Defendants.

CLARKE, Magistrate Judge.

Plaintiff Juan Anthony Sancho brings this cause of action against Jackson County and a number of Jackson County Sheriff's Department officials and deputies. The case arises out of Plaintiff's treatment in the Jackson County Jail in the early morning hours of April 18, 2019. Plaintiff brings claims of excessive force under 42 U.S.C. § 1983, in violation of the Fourth and Fourteenth Amendments, as well as claims under Oregon law for assault, battery, and negligence. The case comes before the Court on the Defendants' motion for summary judgment (#58), and Plaintiff's motions for judgment on the pleadings (#72, #73). For the reasons below, the Defendants' motion for summary judgment should be granted in part and denied in part, and Plaintiff's motions for judgment on the pleadings should be granted.

## BACKGROUND

The parties generally do not dispute the facts as presented by the Defendants regarding the circumstances of Plaintiff's arrest on the streets of Ashland, Oregon in the early morning hours of April 18, 2019. They do, however, dispute many of the facts of his arrival, lodging, and time spent incarcerated in the Jackson County Jail that night, until his release later that day. The Court will review the facts as presented by both parties, indicating material disputes when relevant. The Defendants have submitted numerous declarations and exhibits to support their motion and responses. Plaintiff has submitted a declaration (#90), which includes excerpts from his deposition testimony, to verify and substantiate the facts alleged in his Second Amended Complaint ("SAC") (#51).

### I.    Arrest in Ashland

The undisputed facts show that Plaintiff was extremely intoxicated on the streets of Ashland, Oregon in the early morning hours of April 18, 2019. When officers arrived on the scene, Plaintiff was laying down on the side of Pioneer Street near the curb, and an officer observed Plaintiff stand up and stumble further out into the road. Decl. of Capt. Aldrich Exhibit 7 ("PC Affidavit"); Pietila Exhibit 2 at 2 and 5 ("APD Report"); *see also* Pietila Exhibit 3 at 00:20-00:32 "APD Body Camera Video." Officers determined that Plaintiff was too intoxicated to take care of himself, and he refused to provide any information about where he lived or was staying, or the names of people with whom he was staying. *Id.* Plaintiff told them he did not have his phone or ID on him. *Id.* The officers told him that since he had no friends or phone, or ability to take care of himself, he needed to be taken to the Moore Detox Center for safety. *Id.* When officers tried to put him in handcuffs, he became upset, argumentative, and physically resisted this action. *Id.*

## II.    Lodging at the Jackson County Jail

The Defendants claim that Plaintiff was uncooperative and resistive during the lodging

process, including during the intake search. Decl. Daffron at 3; Decl. Aldrich, Exhibit 3 ("Pat

Down Video") at 00:25, and 01:12. Plaintiff refused to provide an intake Breath Alcohol Content

sample. Administrative Segregation Log ("Ad. Seg. Log") (#69-1) at 1. Deputy Daffron claims

that, as he attempted to search the Plaintiff, Plaintiff grabbed at Deputy Dalton's and Deputy

Daffron's fingers. Decl. Daffron. Deputy Dalton instructed Plaintiff to let go of his hand and to

stop trying to grab other deputies' hands. Decl. Aldrich, Ex. 4 ("Pat Down Mic") at 00:29-00:32

and 00:38-00:42. Defendants claim that Plaintiff continued to grab at fingers and ripped Deputy

Dalton's glove, and he also squeezed Deputy Daffron's hands and tried to twist them. *Id.*

By contrast, Plaintiff claims that Deputy Dalton initiated the wrist lock and elbow joint

manipulation during the pat down when Plaintiff's hands were handcuffed behind his back, and

Deputy Dalton kept him in the wrist lock even after the pat down was finished, as Plaintiff was

escorted to the Intoxilizer Room. After Plaintiff refused the Intoxilizer test, Plaintiff claims

Defendants led him to a room where they took off his jacket, leaving him wearing his pants and

undershirt. Plf. Decl. In order to take off his jacket, deputies had to remove Plaintiff's handcuffs,

and Plaintiff claims that he was cooperative with this process. Plaintiff alleges that during this

time, deputies pushed him and yelled at him. *Id.* He claims that one deputy dropped his jacket to

the floor and told him to pick it up, but he refused because he was afraid that if he bent over,

someone would push him. *Id.* No video evidence exists of this portion of the booking process.

## III.    Placement into the Dry Cell

The Defendants claim that because Plaintiff refused to cooperate with the intake process

and search, the process could not be completed. Decl. Daffron at 3. Plaintiff remained in

civilian clothes and handcuffs, and he was placed in an administrative segregation unit. *Id.* at 4.

Deputies placed Plaintiff in the administrative segregation unit, known as a "Dry Cell," facing

the wall and left the cell after approximately 24 seconds. Decl. Aldrich, Ex. 5, "Dry Cell Video."

The Dry Cell is a room with bare walls, no sink, bed, or chair, and a metal grate in the floor.

## IV.    Takedown and shackling to the floor grate inside the Dry Cell.

Within a minute of being alone in the Dry Cell, Plaintiff slipped his handcuffs from the

back of his body to the front. Dry Cell Video. Within the next two minutes, Plaintiff can be seen

urinating into the drain on the floor of the cell. *Id.* at 02:22. Plaintiff did not ask deputies to use a

restroom prior to slipping his cuffs and urinating on the drain. *Id.*; *see also* Decl. Dalton at 3.

After relieving himself, Plaintiff went to the Dry Cell door and repeatedly hit his handcuffs

against the window, shouting and causing a "loud, disruptive ruckus." Def. MSJ 8 (#58). The

parties agree that Plaintiff was shouting to ask why he was in jail. Plf. Depo at 70, 72-73.

Deputies initially ignored Plaintiff's behavior, then asked him to stop, and then put a black

curtain over the window. *Id.* at 73-75. Plaintiff continued the same behavior for over 25 minutes,

including striking the door and staring at Deputy Dalton, who was instructing him to stop. *Id.* at

75-76.; Dry Cell Video at 4:21-27:57.

At that point, deputies entered the Dry Cell. *Id.*; Decl. Dalton; Decl. Hammond; Decl.

Bjorklund. As the deputies entered the Dry Cell, Plaintiff backed away from the door until he

was backed up against the far wall from the door, facing the door and deputies. Dry Cell Video at

29:50. Deputy Dalton repeatedly pointed towards the back wall of the cell and told Plaintiff at

least two times to turn around and face the wall, but Plaintiff did not turn around. Dry Cell Video

at 31:00; Decl. Dalton at 4. Plaintiff thought the deputies were asking him to back up against the

wall, and he did not understand them to be directing him to turn and face the wall. Plf. Depo 78.

Plaintiff, intoxicated, had his hands in the air – he believed this action to be non-threatening, *id.* but the officers believed it to be "aggressive." Decl. Dalton at 4.

Upon entering the cell, Deputy Dalton reached up and grabbed Plaintiff, then pulled him to the ground with assistance from Deputies Bjorklund and Hammond. Dry Cell Video at 31:50. Deputy Dalton can be seen placing his knee on Plaintiff's back and hip. *Id.* at 31:53. Meanwhile, Deputy Bjorklund placed his knee and shin onto Plaintiff's shoulder and his middle back area. Decl. Bjorklund at 4; Dry Cell Video at 32:11. During this incident, Deputy Dalton is seen rocking back and forth on the hip and upper thigh area of Plaintiff and can be seen pressing down with his weight and repositioning himself several times. Plaintiff alleges this was a forceful take down with multiple knee strikes. SAC at 5. Defendants claim this was a controlled group take down, with no knee strikes or directed blows. Deputy Dalton appears to use his weight to bear down on Plaintiff. At one point, he lifts his knee and moves it to a different position; the amount of force being used is in dispute. Dry Cell Video at 31:52. Deputy Dalton moves off of Plaintiff as he and Deputy Hammond move to control Plaintiff's legs. Defendants claim that Plaintiff was actively resisting and twisting, and the deputies needed to control the situation. Decl. Hammond at 4. Deputy Hammond asserts that he used control tactics, not strikes or focused blows, in order to get Plaintiff into compliance with directives, re-secured, and properly handcuffed. *Id.*

As the deputies stood to exit the cell, Deputy Dalton instructed Plaintiff not to get up or move until the deputies left the cell. Decl. Dalton at 6. He asserts that Plaintiff looked at him, but Deputy Dalton does not recall if he gave a verbal response. *Id.* Approximately 30 seconds after deputies re-handcuffed Plaintiff and left the cell, Plaintiff rolled to his back and attempted to slip the cuffs to the front again but was unable to do so. Dry Cell Video at 34:45. Plaintiff then

returned to the door, turned his back to it, and resumed hitting the door with his hands behind his back. *Id.* at 35:14.

A few minutes later, the video shows Plaintiff being given commands from a deputy outside the cell as he backs up and gets down on his knees. Dry Cell Video at 37:03. Deputies Bjorklund and Hammond then re-entered the cell, laid Plaintiff on his side, on the ground, and handcuffed Plaintiff to the grate in floor of the cell. *Id.*

Plaintiff yelled continuously after the door closed. *Id.* A little over a minute later, Plaintiff rolled to his back and attempted to slip the handcuffs again. *Id.* at 40:01-41:28. After a couple of minutes of failed attempts to slip the handcuffs, Plaintiff sat up. *Id.* Approximately ten minutes after being handcuffed to the grate, Plaintiff began to bang his handcuffs on the grate. Dry Cell Video at 45:58-55:00. This continued for a significant amount of time. Dry Cell Video at 1:05:20-1:06, 1:16:58, 2:35:20. Plaintiff remained in a seated position for nearly the entire time, until jail employees re-entered the cell a few hours later. *Id.*

At 5:35 a.m., the log indicates that Plaintiff was taken out of handcuffs. Ad. Seg. Log at 2. Plaintiff is shown on video being taken out of handcuffs at this time. Dry Cell Video at 3:00:58. The video shows that Plaintiff was handcuffed to the grate approximately 37 minutes after being placed into the cell, and Plaintiff remained cuffed to the grate for approximately 2 hours and 23 minutes until being fully removed from restraints.

Plaintiff was given a meal from Deputy Thurnbauer at approximately 5:57 a.m. Ad. Seg. Log at 2. At approximately 7:05 a.m., Plaintiff provided a BAC of 0.158. Aldrich Ex. 8. Plaintiff was given another meal at 11:15 a.m. Ad. Seg. Log at 3. Plaintiff provided a second BAC at 12:52 p.m., and the result was 0.03. Aldrich Ex. 9. Plaintiff was released on his own recognizance at 12:57 p.m. *Id.*

## LEGAL STANDARD

Summary judgment shall be granted when the record shows that there is no genuine

dispute as to any material of fact and that the moving party is entitled to judgment as a matter of

law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The

moving party has the initial burden of showing that no genuine issue of material fact exists.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Devereaux v. Abbey*, 263 F.3d 1070, 1076

(9th Cir. 2001) (en banc). The court cannot weigh the evidence or determine the truth but may

only determine whether there is a genuine issue of fact. *Playboy Enters., Inc. v. Welles*, 279 F.3d

796, 800 (9th Cir. 2002). An issue of fact is genuine "if the evidence is such that a reasonable

jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

When a properly supported motion for summary judgment is made, the burden shifts to

the opposing party to set forth specific facts showing that there is a genuine issue for trial. *Id.* at

250. Conclusory allegations, unsupported by factual material, are insufficient to defeat a motion

for summary judgment. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the

opposing party must, by affidavit or as otherwise provided by Rule 56, designate specific facts

which show there is a genuine issue for trial. *Devereaux*, 263 F.3d at 1076. In assessing whether

a party has met its burden, the court views the evidence in the light most favorable to the non-

moving party. *Allen v. City of Los Angeles*, 66 F.3d 1052, 1056 (9th Cir. 1995).

## DISCUSSION

Plaintiff asserts multiple claims under 42 U.S.C. § 1983 for excessive force. First,

Plaintiff alleges a claim "against the jailers who took Plaintiff down and chained him to the urine

grate," which include Defendants Bjorklund, Dalton, and Hammond. SAC at 15. Second,

Plaintiff asserts a claim against all named deputies under a theory of "bystander liability." *Id.* at

17. Third, Plaintiff asserts a claim against Defendant Carpenter under a theory of "supervisory liability." *Id.* at 19. It is unclear based on the operative complaint whether Plaintiff asserts excessive force claims against the deputies who processed him at intake and the deputies who tackled him to the ground during the "takedown" in the Dry Cell to resecure the handcuffs behind his back. In an abundance of caution, the Court assumes that these are properly alleged and will address them individually.

Plaintiff also asserts claims for relief under the Oregon Tort Claims Act. As against Defendant Jackson County, Plaintiff alleges one claim of "intentional torts" for assault and battery, and one claim of negligence. Plaintiff further alleges an additional claim of negligence against all individually named Defendants, and one claim of "intentional torts" against Deputies Bjorklund, Dalton, and Hammond. *Id.* at 23-24. Plaintiff's prayer for relief includes a claim for punitive damages.

**I.    Defendants' motion for summary judgment should be granted in part and denied in part.**

Defendants move for summary judgment on all claims. For the reasons below, the defendants' motion should be GRANTED in part and DENIED in part. Defendants are entitled to qualified immunity as to the force used during intake and during the takedown in the Dry Cell. They are not entitled to qualified immunity for handcuffing Plaintiff to the grate in the floor. Sergeant Carpenter and Deputy Sellers are entitled to summary judgment as to supervisory and bystander liability. Defendants are not entitled to summary judgment on any other claims.

**A.  The Defendants are entitled to qualified immunity as to the excessive force claims, except for the claim that they shackled Plaintiff to the grate in the floor.**

Qualified immunity shields government officials from Section 1983 liability 'insofar as

their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800 (1982). The qualified immunity analysis requires a court to address two questions: (1) whether the facts alleged or shown by the plaintiff establish a constitutional violation, and (2) whether the right at issue was clearly established at the time. *Saucier v. Katz*, 533 U.S. 194, 201, (2001); *see also Pearson v. Callahan*, 555 U.S. 223 (2009) (overruling *Saucier's* requirement that qualified immunity analysis proceeds in a particular sequence). The right must have been clearly established at the time of the defendant's alleged misconduct, so that reasonable official would have understood that what he or she was doing under the circumstances violated that right. *Wilson v. Layne*, 526 U.S. 603, 615 (1999). Courts have discretion in deciding which prong to address first, depending on the circumstances of the case. *Pearson*, 555 U.S. at 242-43.

### 1. Plaintiff's allegations raise a triable constitutional violation for excessive force.

Title 42 U.S.C. § 1983 "provides a federal cause of action against any person who, acting under color of state law, deprives another of his federal rights." *Conn v. Gabbert*, 526 U.S. 286, 290 (1999). To maintain a claim under § 1983, "a plaintiff must both (1) allege the deprivation of a right secured by the federal Constitution or statutory law, and (2) allege that the deprivation was committed by a person acting under color of state law." *Anderson v. Warner*, 451 F.3d 1063, 1067 (9th Cir. 2006). It is undisputed that the Defendants were acting under color of state law.

The Fourth Amendment requires an officer to use only an amount of force that is objectively reasonable considering the circumstances facing them. *Tennessee v. Garner*, 471 U.S. 1, 7-8 (1985). To determine whether a specific use of force is reasonable, courts balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against

the countervailing government interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quotation marks and citation omitted).

For a pre-trial detainee, a court must account for the "legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained," appropriately deferring to "policies and practices that in th[e] judgment" of jail officials "are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 540 (1979). Considerations such as the following may bear on the reasonableness or unreasonableness of the force used: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting. *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015) (citing *Graham*, supra, at 396, 109 S.Ct. 1865).

Additionally, "the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment." *Graham*, supra, at 395, n. 10, 109 S.Ct. 1865. Such "punishment" can consist of actions taken with an "expressed intent to punish." *Bell*, 441 U.S., at 538, 99 S.Ct. 1861. In the absence of an expressed intent to punish, a pretrial detainee can nevertheless prevail by showing that the actions are not "rationally related to a legitimate nonpunitive governmental purpose" or that the actions "appear excessive in relation to that purpose." *Kingsley v. Hendrickson*, 576 U.S. 389, 397–98, 135 S. Ct. 2466, 2473 (2015) *(citing Graham., supra, at 561, 99 S.Ct. 1861.*

In this case, Plaintiff alleges:

> Defendants Bjorklund, Dalton and Hammond, acting in concert, subjected Plaintiff to excessive force, including but not limited to requiring Plaintiff to be handcuffed behind his back in a cell with no other occupants and thus no need for Plaintiff to even be in

> handcuffs; entering Plaintiff's cell and violently taking him to the
> concrete floor, delivering unnecessary focused knee strikes to
> Plaintiff's back, kneeling on Plaintiff's neck and causing Plaintiff to
> briefly lose consciousness; and then chaining Plaintiff to the urine
> grate and leaving Plaintiff to lie there alone for approximately 2.5
> hours while Plaintiff posed no threat of harm to anyone. Defendant
> Dalton, in particular, is the jailer who delivered unnecessary knee
> strikes to Plaintiff's mid-back; and defendant Bjorklund is the jailer
> who kneeled on Plaintiff's upper back and neck.

SAC ¶ 17.

In arguing that no constitutional violation occurred, Defendants point to the jail's video

footage to show that there is no genuine issue of material fact, but this argument fails. "The

mere existence of video footage of the incident does not foreclose a genuine factual dispute as to

the reasonable inferences that can be drawn from that footage." *Vos v. City of Newport Beach*,

892 F.3d 1024, 1028 (9th Cir. 2018). As discussed below, Plaintiff disputes the Defendants'

characterizations of the interactions that are visible on the video, and in most cases the sequences

of actions and amount of force used is subject to interpretation or otherwise unclear. Plaintiff

also raises disputes regarding the deputies' treatment of him and his cooperation during the

interactions that are not included in the recording. Finally, even if the physical interactions and

force used against Plaintiff during intake and during the takedown sequences were all reasonable,

the allegation that Plaintiff was handcuffed to a metal grate in the floor that was covered in urine

for 2.5 hours would raise a triable constitutional violation in and of itself.

First, during intake, Deputy Dalton pushed and prodded Plaintiff in the back causing him

to hit the wall. Defendants claim that Plaintiff was not complying with verbal directions, but

Plaintiff disputes this, as he was standing still, and his body was facing the wall. Deputy Dalton

then pushed Plaintiff's head into the wall and maintained a wrist lock and elbow joint

manipulation on Plaintiff's handcuffed right arm. Plaintiff asserts that these pain compliance

holds were unnecessary and unreasonable. Viewing the video footage in the light most favorable to Plaintiff, there is no obvious physical resistance to officer commands, and a reasonable juror could find that the above uses of force were unreasonable under the circumstances.

Second, in justifying their decision that Plaintiff's intake could not be completed, requiring use of the Dry Cell, the Defendants claim that Plaintiff was grabbing a deputy's hand and failing to let go when ordered to do so. Plaintiff disputes this, claiming that it was Deputy Dalton who initiated a wrist lock and would not let go. Viewing the video footage in the light most favorable to Plaintiff, this sequence of events is unclear. A reasonable juror could find that Plaintiff's characterization of the footage is correct.

Third, Defendants point to Plaintiff's disruptive behavior in banging his hands and handcuffs on the door and window, shouting, and "causing a ruckus," to justify entering the Dry Cell, initiating a takedown to resecure his handcuffs, and, ultimately shackling Plaintiff to the grate in the floor where he had recently urinated. Citing *Antoine v. Cnty. of Sacramento*, 2007 WL 4210122, at *6 (E.D. Cal. Nov. 27, 2007), the Defendants assert that "handcuffing an inmate to a grate in the floor is not a per se constitutional violation." Def. Reply 31. The facts of this case are distinguishable from the facts in *Antoine*.

In *Antoine*, the facts were undisputed that the plaintiff "forcefully refused to follow directions during his booking process." *Id.* at 1. He had already assaulted the firefighters that tried to assist him after he ran his car off the road, and he was "belligerent and combative." *Id.* The plaintiff was placed in a safety cell with padded walls and a metal grate in the middle of the floor. When he continued excessively hitting and kicking the safety cell door, after being warned that he would be restrained, the defendants entered the cell, placed him in handcuffs, and shackled his feet to the metal grate. In determining that the plaintiff was not entitled to summary

judgment on his claim that being shackled to the grate was a per se violation of his rights, the

court specifically found that there was no evidence of the grate in the floor being used as a drain

for human waste. *Id.* at 5. The court also found that speculation over whether a less restrictive

alternative should have been used was a purely "mental exercise." *Id.* at 4. The court denied the

plaintiff's motions, in particular "with respect to [plaintiff's] claim that the practice amounts to a

per se violation of the Fourteenth Amendment." *Id.* at 6.

Here, Defendants claim that Plaintiff "refused to participate in the intake screening

process," and that he was potentially violent and could have used his handcuffs as a weapon to

break the Dry Cell Window or to attack a deputy, Plaintiff disputes these assertions. In addition

to the disputes of fact regarding the intake process, discussed above, Plaintiff points to the

"Receiving Screening Questionnaire" from the jail, which states that at 0300 hours, Plaintiff was

"cooperative," and notes that it was just 0309 when Defendants handcuffed him to the grate,

according to the Log. Video evidence shows Plaintiff yelling and banging on the cell door after

being placed in the Dry Cell, but it also shows him unable to slip his handcuffs after deputies re-

secured them, making it much less likely or impossible for him to use the handcuffs as a weapon

against Defendants or as an object to break the window in the cell. Plaintiff has raised a

sufficient question of fact as to whether Defendants' use of force and handcuffing to the grate

was reasonable even when considering the legitimate governmental interest in managing the

facility, preserving internal order, and maintaining institutional security.

In both this case and the *Antoine* case, the plaintiffs were shackled to the grate in the cell

floor.[1] However, the court in *Antoine* specifically found that there was no evidence of the grate

---

[1] Defendants would like the Court to consider this handcuffing in isolation from the circumstances of the
Dry Cell, claiming that Plaintiff does not meet the different requirements of an excessive force claim
"arising solely from handcuff use." Def. MSJ at 36. The Court declines to do so. The use of handcuffs in

in the floor being used as a drain for human waste. Here, we know that Plaintiff urinated on it shortly before he was handcuffed to it.

Finally, while the court in *Antoine* rejected the speculation of a less restrictive alternative as unfair second-guessing of the jail deputies' expertise, here Plaintiff has submitted evidence that there were unused restraint chairs nearby the Dry Cell. Holloway Decl. The Defendants respond by arguing that:

> the Jail is not equipped with the "wall hooks" available to other Jails. Decl. Aldrich at 2. These hooks allow for the handcuffing of an AIC to a fixed object, *i.e.* the wall. *Id.* And it does not matter whether a restraint chair was available because a restraint chair would have been a more-restrictive restraint than the one used here; restraint chairs restrict all movement. Decl. Hammond at 5-6. In contrast, handcuffing a Plaintiff to a fixed object like a wall or a grate allows for movement of the legs, head, and to some extent arms—as is the case here.

While the Court cannot say as a matter of law that Defendants should have used other means to safely restrain Plaintiff, this evidence raises a question of fact regarding whether the handcuffing to the grate was necessary, which a jury is entitled to consider. For all of these reasons, *Antoine* is distinguishable from the case at bar.

A reasonable juror could find that placing Plaintiff into a Dry Cell and initiating the takedown to re-secure his handcuffs, were actions that were rationally related to a legitimate governmental objective in maintaining the safety and security of the facility. However, a reasonable juror could also find that these actions were excessive in relation to that purpose. In particular, and especially when viewing the evidence in the light most favorable to Plaintiff, a reasonable juror could find that handcuffing Plaintiff to a metal grate in a concrete floor, where

---

this instance is not a separate claim, nor is it separable from the circumstances of the urine-covered metal grate in the floor.

he had recently urinated, had no legitimate purpose, and it was a punishment for being loud and disruptive. Plaintiff has established allegations that amount to a triable constitutional violation.

> **2. Plaintiff's right not to be shackled to the floor grate was clearly established; his rights as to the amount of force applied during the intake process and during the takedown were not.**

A right is clearly established when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11, 136 S.Ct. 305, 193 L.Ed.2d 255 (2015) (per curiam) (internal quotation marks omitted). The Supreme Court has repeatedly admonished courts "not to define clearly established law at a high level of generality." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (internal quotation marks and citation omitted). "The dispositive question is whether the violative nature of particular conduct is clearly established. This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* "[S]pecificity is especially important in the Fourth Amendment context, where ... it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Id.* at 12 (alterations and internal quotation marks omitted).

> **a. The contours of the Plaintiff's right not to be shackled to the grate in the floor where he had recently urinated were sufficiently well-established that the Defendants are not entitled to qualified immunity.**

Plaintiff points to cases that have found that chaining an inmate to a stationary object is unconstitutional, though the Court agrees with Defendants that those cases are more egregious than this case and thus distinguishable on their facts. *Hope v. Pelzer*, 536 US 730 (2002) (plaintiff was chained to a hitching post, shirtless, in the sun on a hot day, for seven hours); *Shorter v. Baca*, 895 F.3d 1176, 1179–81 (9th Cir. 2018) (detainees were routinely left naked and chained to their cell doors for hours at a time without access to food, water, or a toilet).

Plaintiff also points to the JCSO policies to show that Defendants knew their actions were unlawful because they were in violation of the jail policies and procedures. For example, Plaintiff highlights that "Policy 302.6 mandates use of only JCSO-authorized restraint devices. The grate in the dry cell is not such a device." Plf. Resp. 44 (#94). "Training materials and regulations are… relevant, although not dispositive, to determining whether reasonable officers would have been on notice that their conduct was unreasonable." *Vazquez v. County of Kern*, 949 F.3d 1153 (9th Cir. 2020).

Finally, Plaintiff argues that conduct that is so egregious that it shocks the conscious should not be shielded by qualified immunity. *Shafer*, 868 F.3d at 1118, fn. 3 (recognizing an exception to the "case-on-point" rule in situations where the constitutional misconduct is "sufficiently obvious" such that the question is beyond debate); *see also Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052 (9th Cir. 2003) (even without a specific case on point, the officers who continued to press their weight onto mentally ill detainee's neck and torso as he lay handcuffed on ground for twenty minutes were not entitled to qualified immunity).

By contrast, the Defendants point to cases deferring to the discretion of the jail staff and corrections officials who must balance the safety and security of the facility with the constitutional rights of the inmates and detainees. These cases are distinguishable on their facts from this case, however. In *Antoine*, discussed above, a court found that shackling a detainee to a grate in the floor was not a constitutional violation under the circumstances of that case, but the court suggests that it might have been if the grate in the floor were used for human waste, or if the detainee had not been combative or violent. 2007 WL 4210122.

Similarly, in *Anderson v. County of Kern*, 45 F.3d 1310 (9th Cir.1995), the Ninth Circuit affirmed the denial of injunctive relief to plaintiff inmates and detainees who alleged that the use

of safety cells for suicidal and mentally disturbed inmates and detainees violated the Constitution. *Id.* at 1315. The Court found that while the safety cell is admittedly a very severe environment, it is employed in response to very severe safety concerns; some detainees and/or inmates became so violent and such a danger to themselves "that temporary placement in a safety cell was needed in order to deprive the prisoners of all means of harming themselves." *Id.* at 1314. Significantly, the Court also acknowledged that if inmates or detainees in the safety cell "are violent, they may be shackled to the grate over the pit toilet." *Id.* at 1313. However, the type of violence that justified this action nearly always included an inmate's attempted suicide or other significant violence against themselves or others. *Id.* A supervisor estimated that "40% of the prisoners placed into the safety cell were suicidal." *Id.* Only some of these were considered violent enough to justify shackling to the grate. *Id.*

Taking all of the above into consideration, the Court finds that even though there is not a factually specific case on point, the contours of the Plaintiff's right not to be shackled to the grate in the floor where he had recently urinated were sufficiently well-established that the Defendants are not entitled to qualified immunity. Plaintiff has raised a question of fact as to the Defendants' assertion that Plaintiff was violent and dangerous to himself or to the jail staff, particularly at the time of the shackling. Plaintiff's handcuffs were securely behind his back, and he was alone and secure in the Dry Cell. Thus, the Court will not defer to the discretion of the deputies regarding their decision to chain Plaintiff to the grate, and the Defendants are not entitled to qualified immunity as to that action.

### b. The force used during the takedown inside the Dry Cell did not violate any "clearly established" rights.

As discussed above, Plaintiff has raised a triable issue as to whether the takedown in the Dry Cell constituted excessive force. Nevertheless, Defendants are entitled to qualified immunity

as to the uses of physical force against Plaintiff during the takedown because Plaintiff's actions created a security threat to the facility, and Plaintiff resisted deputies' instructions when they entered the dry cell. Thus, Plaintiff's rights as to the force used in this instance were not "clearly established."

In *Huber v. Coulter*, the court found that there was a triable fact as to a constitutional violation when defendants used unnecessary but relatively minor force against an arrestee who previously demonstrated a readiness to resist the police but was compliant and nonresisting at the time of arrest. 2015 WL 13173223, at *14 (C.D. Cal. Feb. 10, 2015), aff'd, 684 Fed.Appx. 623 (9th Cir. 2017). However, the court also found that "the violation was not so obvious that the contours of the clearly established law could be defined at a high level of generality." *Id.* "Rather, this is an area in which the result depends on the facts of each case. *Id. See also Emmons v. City of Escondido*, 168 F. Supp. 3d 1265, 1276 (S.D. Cal. 2016) (granting qualified immunity for officer who "tackled to the ground" a non-resisting plaintiff-arrestee).

In this case, it is undisputed that Plaintiff had slipped his handcuffs to the front of his body, and he was banging the cuffs against the window, creating a security threat in the form of a potential broken window, as well as being dangerous for any deputies entering the cell. When deputies entered the cell, they instructed Plaintiff to turn and face the wall, and he raised his hands up, not understanding their instructions. While the Defendants may have been mistaken that Plaintiff's actions were aggressive or threatening, it was not an unreasonable mistake. Defendants did not use focus blows, nor did they use tasers or batons. Plaintiff fails to cite to any legal authorities for the proposition that performing a quick and efficient takedown in this situation in order to re-secure his handcuffs behind his back when he failed to comply with instructions violated any "clearly established" rights.

### c.  The minimal level of force used during the intake process did not violate any "clearly established" rights.

Neither party briefed the issue of the force used during the intake process violated a clearly established right. The Court finds that, as alleged by Plaintiff, the deputies' use of force during intake was minimal and Plaintiff has failed to show that his right not to be subject to such force was clearly established.  However, Plaintiff alleges that he was not violent during that process, but instead that he was compliant and allowed deputies to remove his handcuffs and jacket without incident. These are material facts as to the issue of whether or not Defendants' later use of force in shackling Plaintiff to the grate was reasonable. Therefore, while Defendants are entitled to qualified immunity as to their actions during the intake process, their actions should be allowed to be explored at trial on the issue of shackling to the grate.

### B.  Defendant Carpenter is entitled to summary judgment on the issue of supervisory liability.

"A supervisor can be liable for ...culpable action or inaction in the ...supervision or control of [the supervisor's] subordinates; for...acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998).

Plaintiff alleges that Sergeant Carpenter "witnessed the mistreatment of Plaintiff at intake but said and did nothing to stop that mistreatment, and he accompanied Plaintiff along with Deputies Bjorklund, Dalton, and Daffron to the "Intoxylizer room" and eventually to the Dry Cell. Plaintiff identifies Sgt. Carpenter on the Dry Cell Video as being present when Plaintiff is placed into the cell.  However, there is no indication, and Plaintiff has failed to raise a question of fact, as to whether Sgt. Carpenter knew and acquiesced in the deputies' decision to chain Plaintiff to a grate in the floor. Sgt. Carpenter is entitled to summary judgment on this claim.

### C. "Bystander" liability: Defendant Deputy Sellers is entitled to summary judgment, but Deputy Thurnbauer and any other deputies who were present or provided backup during the time Plaintiff was shackled to the grate are not.

An officer's liability under section 1983 is predicated on his "integral participation" in the alleged violation. *Chuman v. Wright*, 76 F.3d 292, 294–95 (9th Cir.1996). "'[I]ntegral participation' does not require that each officer's actions themselves rise to the level of a constitutional violation." *Boyd*, 374 F.3d at 780. But it does require some fundamental involvement in the conduct that allegedly caused the violation. *See id.* (holding that every officer who provided armed backup for another officer who unconstitutionally deployed a flash-bang device to gain entry to a suspect's home could be held liable for that use of excessive force because "every officer participated in some meaningful way" in the arrest and "every officer was aware of the decision to use the flash-bang, did not object to it, and participated in the search operation knowing the flashbang was to be deployed").

Plaintiff alleges that Deputy Sellers' job that night was to monitor the jail on screens in the control room and control the flow of inmates and deputies by remotely locking and unlocking doors. It is undisputed in the record that Deputy Sellers was on duty on April 18, 2019, working a shift from 0000 hours to 0800 hours. Plaintiff contends that it was her job to have observed Plaintiff in the Dry Cell via the monitors in the control room. None of the allegations or evidence Plaintiff submits, however, indicate that Deputy Sellers' actions rise to the level of "integral participation." Observing her peers' actions in a non-supervisory role, from a remote workstation, with no indication of affirmative or meaningful action, fails to raise a question of fact as to whether Deputy Sellers participated in the alleged deprivation of Plaintiff's rights. Summary judgment should be granted for Deputy Sellers.

Plaintiff alleges that Deputy Thurnbauer was the "backup" for deputies Dalton, Daffron, and Bjorklund in the pat down room, back up for Dalton, Hammon, and Bjorklund in the Dry Cell, and backup for Dalton when he spoke to Plaintiff later that morning while he remained handcuffed to the grate. Plaintiff raises a question of fact as to whether Deputy Thurnbauer was present and providing support for encounters during the time Plaintiff was shackled to the grate, watching from the doorway and just inside the door to the cell. Plaintiff raises a question of fact as to whether Deputy Thurnbauer's actions constitute "integral participation" in the alleged deprivation of Plaintiff's rights in being chained to the grate. *See Boyd*, 374 F.3d at 780 (holding that every officer who provided armed backup for another officer who unconstitutionally deployed a flash-bang device to gain entry to a suspect's home could be held liable for that excessive force). Deputy Thurnbauer is not entitled to summary judgment.

For the same reason, the any named deputies who participated directly, or were present as "backup," were integral participants in shackling Plaintiff to the floor grate. Deputy Bjorkland and Deputy Hammond handcuffed Plaintiff to the grate, and Deputy Dalton spoke to Plaintiff later that morning while he was shackled to the grate. Therefore, none of these deputies are entitled to summary judgment at this time.

**D. Defendants are not entitled to summary judgment as to punitive damages.**

It is well established that a "jury may award punitive damages under section 1983 either when a defendant's conduct was driven by evil motive or intent, or when it involved a reckless or callous indifference to the constitutional rights of others." *Davis v. Mason County*, 927 F.2d 1473, 1485 (9th Cir.1991) (citing *Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1982)); *Morgan v. Woessner*, 997 F.2d 1244, 1255 (9th Cir. 1993). Here, for the same or similar reasons that the Defendants are not entitled to qualified immunity for shackling

Plaintiff to the floor grate, they are not entitled to summary judgment on the issue of punitive

damages. Based on the allegations that they chained Plaintiff to a metal grate in the concrete

floor for over two hours without a legitimate administrative reason, a jury could find that that the

deputies' conduct involved a reckless or callous indifference to Plaintiff's constitutional rights.

### E. Plaintiff's state law claims should not be dismissed, and Defendants are not entitled to summary judgment.

Defendants argue that if the Court grants summary judgment for the Defendants on the

federal claims, the Court should decline to exercised supplemental jurisdiction over the state law

claims under 28 U.S.C. § 1367. Alternatively, Defendants argue that because the force used

against Plaintiff was reasonable as a matter of law, summary judgment should be granted as to

the assault and battery claims as well. Because the Defendants are not entitled to summary

judgment on all federal claims, both of these arguments fail.

Defendants also move to dismiss Plaintiff's negligence claim. Courts in this district have

held that state common-law claim of negligence "may be maintained separately from a § 1983

claim only when the negligence claim is based on facts that are different from the facts on which

the § 1983 claims are based." *Whitfield v. Tri-Metro. Transp. Dist.*, CIV 06-1655-HA, 2009 WL

839484, at *11 (D. Or. Mar. 30, 2009). "The negligence component must pertain to something

other than the actual application of force during the course of the arrest." *Johns v. City of*

*Eugene*, No. 6:16-CV-00907-AA, 2018 WL 634519, at *12 (D. Or. Jan. 30, 2018), *rev'd and*

*remanded on other grounds*, 771 F. App'x 739 (9th Cir. 2019) (*citing Lewis v. City of St.*

*Petersburg*, 260 F.3d 1260 (11th Cir. 2001)). Here, Plaintiff asserts that the negligent conduct by

the Defendants includes the allegations that Deputies Bjorklund, Dalton, and Hammond left

Plaintiff to lie face down, in handcuffs, on the floor of the Dry Cell. Plaintiff argues that this

action was not a use of force, but merely negligent, and it subjected him to a "risk of physical

and suffering and even death." Negligence is a question for a jury, and these facts are sufficiently distinct from the actual application of force in shackling Plaintiff to the grate. Plaintiff's state law claims should not be dismissed.

## II.   Plaintiff's motions for judgment on the pleadings should be GRANTED.

A motion for judgment on the pleadings "challenges the legal sufficiency of the opposing party's pleadings." *Morgan v. Cty. of Yolo*, 436 F. Supp. 2d 1152, 1154–55 (E.D. Cal. 2006), *aff'd*, 277 F. App'x 734 (9th Cir. 2008). Under Fed. R. Civ. P. 12(c), a party may move for judgment on the pleadings "after the pleadings are closed—but early enough not to delay trial." A motion for judgment on the pleadings will only be granted if "there is no issue of material fact in dispute," *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009), and "the moving party is entitled to judgment as a matter of law." *Geraci v. Homestreet Bank*, 347 F.3d 749, 751 (9th Cir. 2003) (citation and quotations omitted).

Plaintiff moves for a judgment on the pleadings, or in the alternative, to strike, the Defendants' eighth and twelfth affirmative defenses.

### A.   Plaintiff's motion as to the eighth affirmative defense should be granted.

The eighth affirmative defense states:

> For further answer and eighth affirmative defense, County Defendants reserve all defenses arising from provisions of the Prison Litigation Reform Act (PLRA), including the provision requiring exhaustion of administrative remedies to plaintiff's claims. Upon completion of discovery in this case, Defendants may yield on this affirmative defense if evidence establishes that Plaintiff complied with the requirements of the PLRA.

Answer (#54 ¶30). Defendants have conceded this motion, and they do not oppose the motion to strike this affirmative defense. The motion (#73) should be granted.

### B.   Plaintiff's motion to strike the twelfth affirmative defense should be granted.

The twelfth affirmative defense states:

> For further answer and twelfth affirmative defense, County
> Defendants allege that any recovery on the complaint is barred by
> the doctrine of unclean hands. This includes, but is not limited to,
> interference with a peace officer, and/or disrupting order and
> discipline in a

Answer (#54 ¶34).

In Oregon, "a party's unclean hands will preclude him from obtaining equitable relief

only when the wrongdoing is related to the transaction giving rise to the claim." *North Pacific*

*Lumber Co. v. Oliver*, 286 Or. 639, 653, 596 P.2d 931 (1979). The improper conduct must have

"sufficiently affected the equitable relations between the parties to justify the trial court's refusal

to grant relief." *Id.* at 559, 596 P.2d 931. Moreover, the party "complaining that his opponent is

in court with unclean hands ... must show that he himself has been injured by such conduct to

justify the application of the principle to the case." *Martin v. Allbritton*, 124 Or.App. 345, 352,

862 P.2d 569 (1993).

In responding to the motion, Defendants assert that Plaintiff's claimed damages for

physical therapy treatment relate to injuries that were not caused by the Defendants' conduct at

the jail on the night in question, but were caused by an unrelated, on-the-job injury. This is

essentially a causation argument, which is covered by the tenth and eleventh affirmative

defenses. The doctrine of unclean hands is inapposite and unnecessary to this defense.

Moreover, to the extent that there is a question of fact regarding the causation of

damages, Defendants can certainly present evidence as to those facts at trial. However, if

Defendants are attempting to raise a question of Worker's Compensation fraud, this is not the

appropriate forum for such a claim, as it has nothing to do with the transaction in question, which

encompasses the actions and conduct of the parties on the night Plaintiff spent in the jail on April

18, 2019. Put another way, whether or not Plaintiff has made a Worker's Compensation claim for the same injuries he alleges in this case does not give Plaintiff "unclean hands" for the events in the early morning hours of April 18 because there was no injury to the Defendants at that time or the equitable relations between the parties, and it did not "impact the transaction giving rise to the claim." Plaintiff's motion (#74) should be granted.

**III.   Plaintiff's evidentiary objections should be dismissed.**

Plaintiff's Response to Motion for Summary Judgment (#94) contains six evidentiary objections. While the Court notes that Defendants agreed to withdraw some of the evidence offered, the Court has determined that the evidence submitted by Defendants has not entitled them to summary judgment on the majority of Plaintiff's claims, and the claims that are entitled to summary judgment are not impacted by the evidence at issue. The parties will certainly have to drill down on the authentication and admissibility of evidence prior to trial, but to do so here would be irrelevant and a waste of resources. These objections should be dismissed, with leave to re-raise them when the case proceeds to trial.

## RECOMMENDATION

Plaintiff's motions (#72, #73) should be GRANTED. Plaintiff's evidentiary objections should be dismissed.

The Defendants' motion for summary judgment (#58) should be GRANTED in part and DENIED in part. Defendants are entitled to qualified immunity for the force applied during the intake process and during the takedown in the dry cell. Deputy Sellers and Sergeant Carpenter are entitled to summary judgment. Defendants are not entitled to qualified immunity as to the decision to shackle Plaintiff to the grate in the floor and the case should be set for trial on this claim and the state law claims.

**SCHEDULING**

This Findings and Recommendation will be referred to a district judge.  Objections, if any, are due no later than fourteen (14) days after the date this recommendation is entered.  Id objections are filed, any response is due within fourteen (14) days after the date the objections are filed.  *See* FED. R. CIV. P. 72, 6.

Parties are advised that the failure to file objections within the specified time may waive the right to appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

DATED this ___15___ day of August, 2023.

_____
MARK D. CLARKE
United States Magistrate Judge